**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JUNE 25, 2008

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v                                                   No.  134473

JUNIOR FRED BLACKSTON,

Defendant-Appellee.

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

At issue in this case is whether defendant is entitled to a new trial on the basis of his argument that two unavailable witnesses' written recantations were improperly excluded from defendant's second trial.  A transcript of the witnesses' testimony from the first trial was admitted as evidence at the second trial and defendant sought to admit the recanting statements for purposes of impeachment.  The Van Buren Circuit Court denied defendant's motion to introduce the statements.  The court also denied defendant's motion for a new trial, in which defendant argued that the statements were improperly excluded.  The Court of Appeals reversed and ordered a new trial.  We conclude that defendant is not

entitled to a new trial because the trial court acted within its discretion when it excluded the recantations and denied defendant's motion for a new trial. Further, any error that may have occurred was harmless. Accordingly, we reverse the Court of Appeals judgment and remand to that court for consideration of any remaining issues advanced by defendant in his claim of appeal.

*FACTS AND PROCEEDINGS IN THE CIRCUIT COURT*

In 2001 and 2002, juries twice convicted defendant, Junior Fred Blackston, for the first-degree murder of Charles Miller.[1] In 1988, Miller was executed and buried in a field near defendant's home in Allegan County. Miller's disappearance remained unsolved until codefendant Charles Lamp ultimately led the police to Miller's body in 2000. At defendant's first trial, codefendants Lamp and Guy Simpson testified against him. The prosecutor permitted Lamp to plead guilty of manslaughter, while Simpson received complete immunity for his testimony. Both codefendants testified that defendant, Lamp, and Simpson took Miller to the field where defendant shot Miller and cut off his ear to show it to a local drug dealer, Benny Williams, as proof that Miller was dead. Lamp testified that he helped defendant plan and execute the murder after defendant learned that Miller planned to rob Williams.

---

[1] Because the trial court acknowledged that it had incorrectly informed the first jury about the nature of a codefendant's plea agreement, it granted defendant's first motion for a new trial.

Defendant testified at the first trial but not at the second. Defendant agrees that the victim was at defendant's house on the night he was murdered. Through alibi witnesses, defendant asserted that he did not leave the house with Miller, Lamp, and Simpson. The defense contended that defendant remained home with his 1½-year-old daughter. The child's mother—defendant's girlfriend at the time, Darlene (Rhodes) Zantello—was pregnant. All parties agreed that she left her 1½-year-old daughter with defendant when Zantello went to the hospital that night because she was experiencing pain. Lamp and Simpson testified that defendant brought his daughter along and left her sleeping in the back seat of the car during the crime.

Zantello testified at the first trial that, when she returned home from the hospital that night, defendant was not present but returned later with Simpson. Zantello overheard Simpson say "that was like a movie with all that blood." She also recalled hearing the men mention an ear being cut off, a pre-dug hole or grave, and that defendant "almost blew his whole head off."

Rebecca (Krause) Mock, Miller's girlfriend at the time of his death, and Mock's sister, Roxann (Krause) Barr, also testified that, in 1990, defendant had admitted his involvement in the murder to them. They said that defendant cried, confessed his participation, and stated that he felt badly about their acts. The police confirmed that shortly after defendant confessed Mock and Barr reported defendant's confession to them.

Defendant's three sisters each confirmed his alibi. Each sister attested that she had visited defendant's house—and had found him home with his daughter—on the night of September 12, 1988, when Miller disappeared. Defendant also produced Williams, who claimed to have known nothing about Miller's death. The investigators acknowledged that they had been unable to link Williams to Miller's murder.

The second jury trial took place in 2002. In the interim, both Simpson and Zantello proffered written statements[2] recanting their former testimony. Simpson claimed that only he and Lamp participated in the murder and that he had implicated defendant for personal advantage under pressure from the prosecutor. Zantello claimed that an abusive boyfriend had pressured her; he sought to gain favor with the prosecutor in a separate case against him. In her recanting statement, she denied having overheard Simpson and defendant talking about the murder and claimed that defendant was home when she returned from the hospital.

Neither Simpson nor Zantello testified at the retrial. Simpson refused to testify. Zantello stated that she could not remember the night of the crime, her previous statements to the police, her previous testimony, or the contents of her recanting affidavit, which she had completed only three months earlier. The trial court declared both witnesses unavailable. It admitted their testimony from the

---

[2] Zantello submitted a sworn and notarized statement. Simpson signed his statement, which included his assertion that the allegations therein were true, but his statement was not sworn and notarized.

first trial under MRE 804(b)(1), which establishes a hearsay exception for former testimony of an unavailable witness. Without citing any authority, defense counsel moved to admit the written recantations to impeach the unavailable witnesses. The court ruled the recantations inadmissible under MRE 613, which addresses prior statements of present witnesses, because the inconsistent statements in the recantations were not asserted *before* the former testimony. The court also ruled that Simpson and Zantello were attempting to manipulate the trial process by conveniently becoming unavailable to testify. Further, it ruled that because the recanting statements could not be cross-examined the prosecutor would be prejudiced by their contradictory claims regarding defendant's innocence.

Defendant was convicted again of first-degree murder and again moved for a new trial. For the first time, he argued that the recanting statements should have been admitted under MRE 806, which permits impeachment of hearsay declarants.[3] The court agreed that the statements *could have been* admitted under

---

[3] MRE 806 states:

> When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant *may* be attacked, and if attacked *may* be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been
>
> (continued…)

5

MRE 806, but opined that it would have excluded them under MRE 403—because their undue prejudice outweighed their probative value—even if defendant had raised his argument under MRE 806 at trial. The court opined that the statements were highly suspect. Not only did they contain collateral and damaging allegations that could not be challenged on cross-examination, but the witnesses had conveniently rendered themselves unavailable to testify just seven and three months, respectively, after they completed their recantations. Therefore, defendant's new argument for admission under MRE 806 did not justify a new trial.

*APPEAL*

Defendant appealed and the Court of Appeals reversed and remanded for a new trial, concluding that the statements should have been admitted under MRE 806. The Court held that any prejudice could have been remedied by redacting portions of the statements and instructing the jury to consider them only for their impeachment value.[4] Applying the harmless error standard of review for

---

(…continued)
  admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination. [Emphasis added.]

[4] *People v Blackston,* unpublished opinion per curiam of the Court of Appeals, issued January 18, 2005 (Docket No. 245099) (*Blackston I*), pp 5-8, vacated 474 Mich 915 (2005).

nonconstitutional error, it concluded that the error required reversal because, more likely than not, it had been outcome determinative.[5]

This Court vacated the Court of Appeals opinion and remanded for that court to "fully evaluate the harmless error question by considering the volume of untainted evidence in support of the jury verdict, not just whether the declarants were effectively impeached with other inconsistent statements at the first trial." We also directed the Court of Appeals to consider whether the error, if any, was harmless beyond a reasonable doubt.[6] On remand, the Court of Appeals repeated its conclusion that the statements should have been admitted and, therefore, that the trial court abused its discretion when it denied defendant's new trial motion. The Court of Appeals also concluded that the error was not harmless beyond a reasonable doubt and again ordered a new trial.[7] The prosecution applied for leave to appeal to this Court and we ordered oral argument to consider whether to grant leave or take other action.[8] We now reverse.

*STANDARD OF REVIEW*

The correct standard of appellate review of defendant's claimed evidentiary error has generated considerable debate in this case. The prosecution originally

---

[5] *Id.* at 9.

[6] *People v Blackston,* 474 Mich 915 (2005).

[7] *People v Blackston (On Remand),* unpublished opinion per curiam of the Court of Appeals, issued May 24, 2007 (Docket No. 245099) (*Blackston II*).

[8] 480 Mich 929 (2007).

7

conceded that any error was preserved constitutional error—because it implicated defendant's confrontation rights—and therefore subject to review for whether it was harmless beyond a reasonable doubt.[9]  But the Court of Appeals found it unnecessary to decide whether the error was constitutional in nature.  It held that reversal was required even under the less stringent standard for nonconstitutional error, concluding that it was more probable than not that the error was outcome determinative.[10]  Our order of remand presumed that the standard governing preserved constitutional error applied.[11]  The prosecution now argues that any evidentiary error is subject to plain error review because defendant did not sufficiently preserve the claim of error at trial.[12]  Because we conclude that the error, if any, was harmless under any of these standards, and because the Court of Appeals did not explicitly analyze which standard of review was appropriate, we find it unnecessary to resolve this question.

---

[9] *People v Carines,* 460 Mich 750, 774; 597 NW2d 130 (1999); *Blackston I, supra* at 9 n 3.

[10] *Carines, supra* at 774; *Blackston I, supra* at 9 n 3 and accompanying text.

[11] 474 Mich 915 (2005).

[12] Under the plain error standard, defendant would be obliged to show that (1) an error occurred, (2) the error was plain or obvious, and (3) the error affected the outcome of the trial.  *Carines, supra* at 763.  Reversal is then warranted only if defendant is actually innocent of the crime or if the error "'seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings . . . .'"  *Id.,* quoting *United States v Olano,* 507 US 725, 736; 113 S Ct 1770; 123 L Ed 2d 508. (1993) (internal citation omitted; brackets in original).

A trial court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion.[13] A trial court may be said to have abused its discretion only when its decision falls outside the principled range of outcomes.[14]

*ANALYSIS*

First, we conclude that the trial court acted within its discretion in denying defendant's motion for a new trial. At trial, defendant moved that he be "allowed somehow" to introduce the unavailable witnesses' statements as impeachment evidence.[15] At the new-trial hearing, he argued that MRE 806 required admission of the statements. The trial court concluded that evidence impeaching hearsay declarants that qualifies for admission under MRE 806 is not *automatically* admissible. Rather, other jurisdictions have held with regard to the rule's counterparts, FRE 806 and similar state provisions, that such evidence is still subject to the balancing test under MRE 403 or its equivalent. The trial court's conclusion is supported by the plain language of MRE 806, which provides that the credibility of the declarant "*may* be attacked, and if attacked *may* be supported . . . ." (Emphasis added.) There is nothing in the rule of evidence that *requires* admission of an inconsistent statement, and MRE 806 provides no greater leeway

---

[13] *People v Cress,* 468 Mich 678, 691; 664 NW2d 174 (2003).

[14] *People v Babcock,* 469 Mich 247, 269; 666 NW2d 231 (2003).

[15] The dissent asserts, and the prosecution appears to assume, that defendant moved for admission under MRE 613. *Post* at 7 n 5, 21. The trial transcript reveals to the contrary that defendant did not cite any court rules. In the face of his failure to cite any authority, the trial court itself cited MRE 613 among its reasons for denying defendant's motion.

regarding admissibility of a statement for impeachment purposes than is granted to litigants offering impeachment evidence in general.[16] This Court expressly permits employing a balancing analysis under MRE 403 when considering the admissibility of other forms of impeachment evidence. See *People v Brownridge,* 459 Mich 456, 461; 591 NW2d 26 (1999). Thus, it is within the trial court's discretion to exclude the evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403.[17]

"Rule 403 determinations are best left to a contemporaneous assessment of the presentation, credibility, and effect of testimony" by the trial judge. *People v VanderVliet,* 444 Mich 52, 81; 508 NW2d 114 (1993). Assessing probative value against prejudicial effect requires a balancing of several factors, including the time

---

[16] We fail to see the relevance of the dissent's suggestion that "[i]t is undisputed that if Simpson and Zantello had testified against defendant at his second trial, the statements at issue here would have been admissible as prior inconsistent statements." *Post* at 10. We cannot know what testimony Simpson and Zantello would have given if they had testified at the second trial. It is pure speculation to assume that the content of their testimony would have justified admission of their recantations. Further, we have no reason to assume that their recantations' admissibility under these hypothetical circumstances would be "undisputed." To the contrary, the extent of their admissibility would be debatable and even the admissible portions would be carefully considered under MRE 403.

[17] See, e.g., *Vaughn v Willis,* 853 F2d 1372, 1379 (CA 7, 1988); *Arizona v Huerstel,* 206 Ariz 93, 104; 75 P3d 698 (Ariz, 2003); cf. *United States v Grant,* 256 F3d 1146, 1155 (CA 11, 2001) (requiring admission of evidence under FRE 806 but leaving open whether FRE 403 may sometimes bar evidence otherwise admissible under FRE 806).

required to present the evidence and the possibility of delay, whether the evidence is needlessly cumulative, how directly the evidence tends to prove the fact for which it is offered, how essential the fact sought to be proved is to the case, the potential for confusing or misleading the jury, and whether the fact can be proved in another manner without as many harmful collateral effects. *People v Oliphant,* 399 Mich 472, 490; 250 NW2d 443 (1976). Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence. *People v Mills,* 450 Mich 61, 75-76; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995). As we have previously noted, a party may strike "'as hard as he can above, but not below, the belt.'" *People v Vasher,* 449 Mich 494, 501; 537 NW2d 168 (1995), quoting McCormick, Evidence (2d ed), § 185, p 439.

In this case, the court ruled that the recantations would have qualified for admission under MRE 806, but concluded that their prejudicial nature outweighed their probative value under MRE 403. The court reasoned that their probative value was limited because both Zantello and Simpson had been effectively impeached during cross-examination at the first trial. Zantello's testimony at the first trial revealed that she had initially told the police that defendant was home on the night of the murder and only later asserted his absence. Further, Simpson had regularly changed his story; his statements varied regarding defendant's involvement in the crime.

11

The court also concluded that the recantations were highly prejudicial; Zantello and Simpson did not merely recant their former accusations, but provided lengthy explanations for why they had lied. Simpson's statement in particular amounted to an epistle advocating defendant's acquittal. The court opined that Simpson's statement likely would not have been admissible even if he had testified. At a minimum, Simpson would have been vigorously cross-examined regarding the statement had he testified. Yet, because he rendered himself unavailable at the second trial, he foreclosed the possibility of cross-examination regarding his wide-ranging assertions.[18]

We conclude that the court's decision was principled and supported by Michigan law. The trial court reasonably excluded the statements because they were highly unfairly prejudicial. Most significantly, to the extent that the statements' irrelevant or unfairly prejudicial content could have been redacted as suggested by the Court of Appeals, their remaining contents would have been largely cumulative.

---

[18] The court also opined that Simpson had consistently attempted to manipulate the trial process by recanting but then engineering his own absence. Simpson recanted only after receiving the benefit of immunity from prosecution and then would not cooperate with the judge at the retrial lest he lose that immunity. Before the retrial, Simpson wrote to the judge that he would refuse to testify. He ultimately appeared before the court, but the court declared him unavailable after he refused to take the stand.

Simpson's recantation, which is unsworn,[19] is an eight-page missive, more than half of which is devoted to recounting hearsay statements purportedly made by various attorneys associated with the case. For example, Simpson asserts that the prosecutor regularly advised Simpson that he "does not believe in 'God,'" and that defendant's own attorney encouraged Simpson to testify against defendant because Simpson would be "crazy" not to accept the prosecutor's offer of immunity. The general tenor of the recantation is that the prosecutor essentially admitted to Simpson that he intended to convict defendant without regard to whether defendant was innocent. Simpson claims that the prosecutor forced Simpson to commit perjury at the first trial in order to achieve his goal. These unsworn statements would inject the specter of prosecutorial corruption into the trial in a manner that the prosecutor could not directly challenge given that Simpson refused to take the stand; the allegations injected issues into the trial that went far beyond Simpson's credibility. Therefore, their potential for misleading or confusing the jury—and, thus, their potential for unfair prejudice—was great.

With respect to Zantello's recanting statement, she claims to have previously perjured herself as a result of cajoling statements by a former boyfriend, who never testified and was never cross-examined about his

_____

[19] Indeed, as the dissent notes, *post* at 2 n 1, Simpson confirmed that he accused defendant of the murder each time Simpson testified under oath; he accused defendant under oath in response to an investigative subpoena as well as at the first trial. Simpson asserted that defendant was not present at the murder only in unsworn, out-of-court statements.

involvement. Although Zantello testified briefly at the second trial, she was unable to answer the prosecutor's questions because she did not "recall what [she] said" and did not want to "incriminate [her]self because of [her] former testimony" inculpating defendant. Both witnesses were thus unwilling or unable to testify regarding the contents of the statements that they signed just seven and three months, respectively, before the retrial.

For these reasons, the trial court reasonably concluded that the statements' potential for prejudice was great. They largely contained unduly prejudicial hearsay and accusations regarding collateral issues with the potential to mislead the jury. As the Court of Appeals correctly observed, the statements could have been redacted to the extent that their contents were inadmissible or unduly prejudicial. But the remaining information was still properly excluded because it was largely cumulative when used for its only admissible purpose: impeachment.[20] Because Simpson and Zantello were impeached with information substantially similar to the information contained in the statements, we cannot agree with the dissent that exclusion of the statements "resulted in the jury being painted a false picture." *Post* at 17.

Specifically, Simpson's statement admits that he made inconsistent statements to police beginning in 1989 "when doing so served [his] best

---

[20] Significantly, as will be discussed further *infra,* the central error of the Court of Appeals' analysis is that it considers the statements' contents for their truth, rather than merely for impeachment purposes.

interest[s]. (ie: getting-deals [sic] on other non-related offenses)." He states that he lied at the first trial to avoid perjury charges and gain immunity from prosecution. He also reiterates that Lamp had threatened to kill him or his family if he implicated Lamp. He proceeds to give an account of events on the night of the murder in which he asserts that Lamp, not defendant, killed Miller. Simpson's cross-examination during the first trial, which was read at the second trial, had similarly revealed that Simpson told varying stories over the years regarding who was responsible for the murder in order to gain personal advantage. His testimony also revealed that he had been threatened by Lamp. Simpson also explicitly acknowledged during the first trial that, if he did not accuse defendant of the murder at trial as he agreed to do in exchange for full immunity, Simpson would face various charges, including perjury. The second jury was fully informed of Simpson's immunity deal.

Zantello's statement similarly repeats assertions that she made at the first trial and that were read into the record at the second trial. At the first trial and in her recanting statement, Zantello confirmed that she originally told the police that she knew nothing about the murder and did not overhear defendant and Simpson talk about any murder. Indeed, as with Simpson, the primary permissible use of Zantello's recantation would have been to show the jury that she had reverted to a previous version of her story, not that she was claiming defendant's innocence for the first time. Accordingly, it is significant that defense counsel succeeded in confronting Zantello with the fact that she had recanted by explicitly asking her at

the second trial whether she remembered making a statement that defendant "was home when [she] got home and that [she] had lied under oath originally because [she] had been threatened." She simply answered: "No, I do not."

Under these circumstances, the admissible portions of both statements were largely cumulative to the remaining evidence relevant to Simpson's and Zantello's credibility, which was presented at both trials and, with regard to Zantello, which was expanded on during her live testimony at the second trial. Therefore, the trial judge—who had become familiar with the witnesses over the course of two trials—did not abuse his discretion when he denied defendant's motion for a new trial on the basis of defendant's argument that admission was required under MRE 806. At a minimum, the trial court was called upon to make a close, discretionary decision regarding whether the danger of undue prejudice that the statements presented outweighed their probative nature. Moreover, the court was required to consider defendant's claim for admission on the basis of an argument that defendant did not advance until after trial and, therefore, which the court was unable to evaluate contemporaneously at the time of the objection. Indeed, at trial, defendant not only failed to cite a single court rule, but he moved to admit each statement in its entirety; he did not argue for admission under MRE 806 of redacted versions of the statements to avoid unfair prejudice to the prosecution. Under these circumstances, we disagree with the dissent's contention that exclusion of the statements amounted to error, let alone *plain* error. "[T]he trial court's decision on a close evidentiary question . . . ordinarily cannot be an abuse

16

of discretion." *People v Sabin (After Remand),* 463 Mich 43, 67; 614 NW2d 888 (2000). Here, where the court was faced with the witnesses' unfairly prejudicial and largely cumulative inconsistent statements, we cannot say that the court's decision lay outside the range of principled outcomes.

Further, the trial court's discretionary decision in this case differs from that of the trial court in *United States v Grant,* 256 F3d 1146, 1155 (CA 11, 2001), on which the dissent relies. In *Grant,* a co-conspirator never testified because he had been deported before the trial took place. *Id.* at 1153. The co-conspirator's previous, arguably inculpatory statements were read into the record; the statements circumstantially linked the defendant to the conspiracy but did not directly name him as a conspirator. *Id.* at 1152-1153. At trial, defense counsel properly moved under FRE 806 for admission of exculpatory statements the co-conspirator made after he had been deported, in which he affirmatively claimed that the defendant was uninvolved. *Id.* at 1153.[21] The trial court denied the motion, ruling that the exculpatory statements were not actually inconsistent with the co-conspirator's earlier, circumstantially inculpatory statements. *Id.* The Eleventh Circuit Court of Appeals reversed, concluding that the trial court's view of inconsistency was too narrow and that the exculpatory statements would have significant probative value

---

[21] Thus, in contrast to the case before us*,* defense counsel contemporaneously argued for admission under FRE 806 *at trial.* Yet the prosecutor did not argue that admission created undue prejudice until the issue was reviewed on appeal. *Id.* at 1155.

with regard to the credibility of the purportedly inculpatory statements. *Id.* at 1153-1155.

The circumstances of *Grant* differ from those of the case before us in crucial respects. First, the exculpatory statements in *Grant* were significantly more probative because they appear to have been the co-conspirator's *only* exculpatory statements. For this reason, in contrast to the instant case, they were not cumulative. Second, although the prosecutor in *Grant* observed on appeal that the exculpatory statements were unreliable because they were made only after the co-conspirator was deported, the trial court in *Grant* did not find that the co-conspirator explicitly attempted to manipulate the trial process by injecting collateral issues into the trial or gained an advantage by changing his story. Rather, as noted earlier, the court concluded that the statements did not directly contradict each other. In sum, without regard to whether we agree with the *Grant* court's holding, we conclude that *Grant* is distinguishable.[22]

Most significantly, even if the trial court in this case erred, any error was harmless under each of the potentially applicable standards of review. The harmless error analysis employed by the Court of Appeals was clearly erroneous

---

[22] We agree with the dissent that the facts of *Vaughn v Willis,* 853 F2d 1372, 1379 (CA 7, 1988), are not perfectly comparable to those of the instant case. Here, the facts fall on a spectrum somewhere between those of *Grant* and those of *Vaughn.* But the mere fact that the unique circumstances of this case and those of *Vaughn* are different in no way requires the conclusion that the trial court abused its discretion here.

for several reasons.  On remand, when considering the effect of any error on the remaining evidence presented at trial, the Court reasoned:

> Lamp's testimony would be subject to the utmost scrutiny, given his undisputed involvement in the murder, his plea agreement, and defendant's theory, supported by many of the impeaching statements that were not admitted, that Lamp had done the shooting himself. Further, much of the interlocking testimony concerned the allegation that defendant killed Miller and cut off his ear at the direction of drug dealer Benny Williams. However, police testified that they had no evidence connecting Williams to the murder, Williams testified that he did not know Miller and had not received one of his ears, and police also testified that there was no physical evidence indicating that Miller's ear had been cut off. Regarding Mock and her sister, there was testimony that they and defendant were always drinking when they were together. Further Mock, her sister, and Z[a]ntello, who was supposedly present during some of the discussions, gave differing accounts of what defendant said. Lastly, we conclude that the evidence overwhelmingly supported that defendant knew something about the murder, but his role, and the extent of his knowledge and participation or assistance, largely depended on Simpson's testimony.[23]

First and foremost, the court erred as a matter of law by considering the recanting statements for improper purposes.  It erroneously concluded that defendant's theory that Lamp committed the shooting without defendant's aid would have been supported "by many of the impeaching statements that were not admitted, that Lamp had done the shooting himself."  To the contrary, had the statements been admitted, they could not have been directly considered as evidence in favor of the defense theory.  They could have been used *only* for the purpose of

---

[23] *Blackston II, supra* at 9.

impeaching the credibility of Simpson and Zantello.[24]  MRE 806.  Thus, *at the very most*, the statements would have caused the jury to discredit entirely Simpson's and Zantello's testimony inculpating defendant.  The remaining untainted evidence—in the form of testimony from Lamp, Mock and Barr—alone established beyond a reasonable doubt that defendant was at least an accomplice to first-degree, premeditated murder.

The Court of Appeals mischaracterizes the untainted evidence by essentially dismissing the very significant testimony of Mock and Barr.  The sisters both described a specific night and location at Lion's Park where defendant tearfully apologized and admitted to them that he had participated in Miller's murder.[25]  Mock recalled that defendant specifically told her that defendant pulled the trigger and cut off Miller's ear.  Barr recalled defendant saying that defendant was present at the murder but thought that he said Lamp had pulled the trigger.  Barr also testified that, around the time of the murder, she had been at someone's house and "they were saying that Charles' ear was in the freezer."  Most significantly, Mock attested that, in April 1990, in light of defendant's confessions, Mock convinced him that he should speak with the police.  Defendant

---

[24] The dissent similarly errs when it asserts that the content of the recantations would have supported defendant's claim of innocence instead of being used only to undermine the credibility of Zantello and Simpson.  See, e.g., *post* at 20.

[25] Defendant confessed twice: once at Lion's Park, to Mock and Barr, and on a separate occasion to Mock and Zantello at Zantello's house after defendant had moved out of the house.

20

initially agreed to do so the next day. Mock called the police and told them about defendant's admissions but, by the time the police contacted defendant, he refused to provide them any details. Michigan State Police Detective Sergeant Dana Averill confirmed that Mock contacted the police and that Mock, Barr, and Zantello gave statements regarding defendant's admissions.[26] Overall the substantially consistent testimony of Mock and Barr, which was confirmed in part by Averill's testimony, provided strong evidence against defendant. Significantly, their testimony also directly corroborated Lamp's testimony and added to his credibility. The Court of Appeals clearly erred when it simply discounted their testimony because they were "always drinking when they were together" and "gave differing accounts of what defendant said."[27]

---

[26] Averill also spoke to defendant at that time and testified that defendant never specifically denied his involvement but was uncooperative and said something like, "When the time comes, the truth will come out and I'll tell you when I'm ready."

[27] The dissent also discredits the testimony of Mock and Barr. But, contrary to the dissent's implications, their testimony was consistent with regard to defendant's critical admissions that he was present during and directly involved in the murder. For example, Barr *did* come to believe that defendant cut off Miller's ear; she simply could not remember whether defendant or someone else had first told her this. She admitted that she remembered only "pieces" of defendant's confession to her and Mock because she had been drinking at the time. The dissent also emphasizes that Mock was a suspect during the investigation of Miller's death. *Post* at 19. But there is no reason to conclude that the jury would have entirely discredited Mock's testimony for this reason. As Mock explained during her testimony, Mock had been a suspect but she had not been singled out by the police; rather, she explained that "[e]verybody was" a suspect at the time. Overall, the dissent focuses on minor discrepancies among the details of Mock's and Barr's testimony. But such discrepancies are unsurprising when the testimony

(continued…)

Finally, because Zantello's and Simpson's recantations could not have been introduced for their truth, defendant still would have been left to rely on the defense theories that he presented at trial to cast doubt on the consistent testimony from Lamp, Mock, and Barr. His primary alibi defense depended solely on the testimony of his three sisters, which was suspect because of their obvious bias in favor of their brother. Defendant also relied, as does the dissent, on Williams's unsurprising testimony that, although Williams was a "fairly large-scale cocaine dealer" at the time of Miller's murder, he did not commission the murder. A police officer also attested that the police were unable to link Williams to the crime. But, significantly, even the defense conceded in closing argument that Miller planned to steal from Williams; the defense simply argued that Lamp, "having heard Mr. Miller . . . was going to steal from Benny Williams, fearing that he, Mr. Lamp, was next, he decided that Miller had to die first." Regarding the lack of physical evidence establishing that Miller's ear had been cut off, all parties agreed that Miller's remains were skeletal and that most of the soft tissue had decayed. Contrary to the implications of defendant and the dissent, no testimony or physical evidence affirmatively suggests that Miller's ear was *not* severed. The defense also attempted to divert the jury from Lamp's description of the crime by

_____

(…continued)
occurred a decade after the relevant events and conversations took place. The jury had reason to credit their testimony precisely because of the substantial similarity of their memories of the relevant events despite this significant lapse in time.

presenting several experts who opined that Miller may have been killed by blunt force, rather than by a bullet. Yet Lamp himself testified that Lamp had access to guns and therefore encouraged defendant to shoot Miller instead of beating him to death, that Lamp provided the gun defendant used to kill Miller, and that Lamp sold the gun after the crime. Therefore, the defense theory that Miller was beaten, rather than shot, did little to inculpate Lamp and exculpate defendant.

In sum, the volume of untainted evidence against defendant was significant. The facts do not cast reasonable doubt on the prosecutor's theory of the case. In particular, nothing in the record suggested that Mock and Barr had any motive to falsely implicate defendant. They came forward early in the investigation and the details and timing of their testimony were directly confirmed by the police. Although Zantello's and Simpson's original inculpatory testimony certainly would strengthen the prosecution's case, their testimony was not critical for the prosecution because defendant's culpability was clearly established by the other witnesses. Moreover, because the jury had already heard the evidence impeaching Simpson and Zantello that was offered at the first trial, and had obviously chosen to disregard it, the likelihood that the jury would have been convinced by cumulative impeachment evidence was slight in light of the fact that Simpson's and Zantello's inculpatory testimony so clearly coincided with the untainted evidence. In light of the volume of untainted evidence against defendant, any error did not affect the outcome of the case.

23

*CONCLUSION*

We hold that the trial court did not abuse its discretion when it denied defendant's motion for a new trial on the basis of defendant's argument that MRE 806 required admission of Simpson's and Zantello's highly prejudicial and cumulative recantations. Further, any error would also have been harmless under any of the potentially applicable standards of review. The Court of Appeals erred as a matter of law by considering the recantations for the truth of the matters of asserted, instead of as impeachment of the recanting witnesses' testimony, and improperly dismissed the testimony of two key prosecution witnesses. For these reasons, we reverse the judgment of the Court of Appeals and remand the case to that court for consideration of defendant's remaining issues on appeal.

Maura D. Corrigan
Clifford W. Taylor
Elizabeth A. Weaver
Robert P. Young, Jr.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellant,

v                                               No. 134473

JUNIOR FRED BLACKSTON,

     Defendant-Appellee.

_____

MARKMAN, J. (*dissenting*).

Following a jury trial, defendant was convicted of first-degree murder. However, the trial court granted defendant's motion for a new trial because the jury was misinformed regarding the extent of the immunity granted to a witness in exchange for that witness's testimony against defendant. After the first trial, but before the second trial, two witnesses, in signed, written statements, recanted the testimony that they had provided in the first trial against defendant. Although the trial court admitted these witnesses' testimony from the first trial, the trial court excluded their recanting statements. Following a second jury trial, defendant was again convicted of first-degree murder. The Court of Appeals reversed and remanded for a new trial, concluding that the trial court had abused its discretion in excluding the recanting statements and that the error was not harmless. The majority here today reverses the Court of Appeals, concluding that the trial court

did not abuse its discretion in excluding the statements and that any error was harmless. Because I agree with the Court of Appeals that the trial court abused its discretion in excluding the statements and that this error was not harmless, I dissent.

## I. FACTS AND PROCEDURAL HISTORY

In 2001, following a jury trial, defendant was convicted of first-degree murder for the shooting death of Charles Miller in 1988. During this first trial, Guy Simpson, an alleged accomplice who was given full immunity in exchange for his testimony against defendant, testified that defendant, Charles Lamp, and himself were present when Miller was shot, but that defendant was the one who actually shot Miller.[1] He also testified that defendant cut off Miller's ear and that defendant had told him that he needed to show Miller's ear to Benny Williams, a local drug dealer. Simpson admitted that he had, in the past, told several different versions of the events, including one in which only he and Lamp, and not defendant, were involved in Miller's death. However, a police officer testified that Simpson's version of the events had always been the same-- defendant was

---

[1] Before Simpson testified, Simpson stated that his previous statement under oath against defendant, pursuant to an investigative subpoena, was not truthful, and that he now wanted to testify truthfully, but he was concerned that if he did so he could be charged with perjury. When the court instructed him that he, indeed, could be charged with perjury if he testified differently from his previous statement, Simpson stated, "so, it'll put a hindrance on my testimony today." Neither the jury at the first trial nor the jury at the second trial was privy to this conversation.

2

the shooter-- on the occasions that he had interviewed Simpson. Simpson also confirmed that Lamp had, in the past, threatened to kill him if he endangered Lamp's plea agreement in any way. Finally, Simpson testified that defendant had an affair with Lamp's wife.

Lamp, who testified pursuant to a plea agreement under which he pleaded guilty of manslaughter and received a 10- to 15-year sentence, also testified that defendant shot Miller while Lamp and Simpson were present, and that defendant cut off Miller's ear. Lamp further testified that defendant killed Miller for Williams. He admitted that he had once threatened to kill Simpson if Simpson talked to the police. Lamp eventually took the police to the location where Miller's remains were found.

Darlene Zantello, defendant's girlfriend at the time of the murder but no longer so at the time of the trial, testified that when she arrived home on the night of the murder, nobody was there; defendant and Simpson arrived later, and she heard them talking about blowing someone's head off and cutting someone's ear off. She also testified that about a year or two later, while they were all drinking, she heard defendant say to Rebecca Mock, Miller's girlfriend at the time of his death, that he was sorry that "they did what they did," although he did not say that he was the one who did it. On cross-examination, Zantello denied that she had initially told the police that defendant was at home when she arrived there and that defendant was not involved in Miller's death.

Rebecca Mock and her sister, Roxann Barr, testified that one night when they were all drinking, defendant admitted being present when Miller was killed. However, Mock and Barr offered differing accounts of what exactly defendant said, including whether he stated that he killed Miller.[2]

Three of defendant's sisters supported his alibi defense. They all testified that he was at home on the night that Miller was killed. According to Lamp and Simpson, defendant killed Miller for Williams, but Williams testified that he did not know Miller or anything about Miller's death, and there is no evidence linking Williams to Miller. In fact, a police officer testified that the police had concluded that Williams was not involved in the murder. Finally, contrary to the testimony of Simpson and Lamp, the police testified that there was no physical evidence indicating that Miller's ear had been cut off.

After the first trial, the trial court granted defendant's motion for a new trial because the jury had been misinformed regarding the extent of the immunity that

---

[2] Mock testified that defendant said that he was the shooter, but Barr testified that defendant did not admit to being the shooter. In addition, Mock testified that defendant said that he cut off Miller's ear, but Barr testified that she did not think that defendant said anything about cutting off Miller's ear. Both Mock and Barr admitted that Mock had been a suspect in Miller's murder.

In addition, Lamp testified that when he arrived at defendant's house, Simpson was already there and Miller arrived later. However, Simpson testified that when he arrived at defendant's house, Miller was there, and Lamp arrived later. Meanwhile, Mock testified that defendant and Lamp came to her house to pick Miller up, but that Miller was not ready then, so he went to defendant's house later. Finally, Zantello testified that Simpson was at defendant's house before Miller.

4

was granted to Simpson in exchange for his testimony against defendant. After the first trial, but before the second trial, Simpson and Zantello provided signed and written statements recanting the testimony that they had presented against defendant at his first trial.

Simpson's signed and written statement explained that Lamp was the one who shot Miller, and that defendant was not even present when Lamp did so. Simpson stated that defendant was at home when he left with Miller and Lamp, and that defendant was still at home when Lamp dropped him off at defendant's house later that evening after Lamp shot Miller in front of Simpson. As far as he knew, defendant was at home that entire evening. Simpson further stated that the prosecutor threatened to charge him with obstruction of justice if he did not testify against defendant, but promised him "full immunity" if he testified against defendant, even though Simpson asserted that he told the prosecutor that defendant was innocent. He also explained that all his statements to the police implicating defendant were given while he was incarcerated for unrelated crimes and were given to benefit himself while he was facing criminal charges. Finally, he explained that he was not making these statements because of his friendship with defendant as he had not seen defendant in over 11 years.

Similarly, Zantello explained in a signed, written, notarized affidavit that the first statement that she gave to the police was the truth; that is, defendant was at home when she arrived home that evening and she did not know anything about Miller's murder. She explained that about 10 months after the murder, she was

5

arrested for disorderly conduct and was instructed to implicate defendant in Miller's murder. She further explained that her boyfriend at the time of defendant's first trial, Robert Lowder, was released from jail even though he had two felony charges pending against him. Lowder told her that if she testified against defendant, he would not go to prison for his felony charges. The prosecutor in charge of Lowder's case was also the prosecutor in charge of defendant's case, and she was afraid of Lowder. The two felony charges pending against Lowder were for beating her. Finally, she admitted that she never overheard any conversations about Miller's murder, and that defendant had always told her that he was not involved in Miller's murder.[3]

At defendant's second trial, the court ruled that Simpson and Zantello were unavailable on the basis of their unwillingness to testify and alleged memory problems.[4] Although the trial court admitted these witnesses' testimony from the

---

[3] Defendant argues that it is unlikely that Zantello is lying to help him, given that she sent a letter to defendant the day after she testified against him at his first trial stating that she hated him and hoped that he would die in prison, and she signed the affidavit recanting her testimony against defendant after this.

[4] Simpson said that he would testify after he was allowed to shower because apparently he was in the "hole" the night before and was not allowed to shower. The trial court deemed this to be a refusal to testify. Simpson did not testify even though his counsel warned him on the record that there was a "strong possibility" that he would be charged with perjury if he did not testify and that he was "risking his immunity that was granted to him." Zantello took the stand and stated that she could not recall any of the events because of her long-term drinking problem. One of the issues that defendant raised on appeal was whether the trial court erred in considering Simpson and Zantello unavailable. Given its holding on the present issue, the Court of Appeals did not address this issue.

6

first trial as prior testimony of unavailable witnesses under MRE 804(b)(1), it excluded their subsequent recanting statements. In 2002, following a second jury trial, defendant was again convicted of first-degree murder.

The trial court denied defendant's motion for a new trial, holding that although the witnesses' recanting statements were admissible under MRE 806, they were properly excluded under MRE 403.[5] The Court of Appeals subsequently reversed and remanded for a new trial. *People v Blackston,* unpublished opinion per curiam of the Court of Appeals, issued January 18, 2005 (Docket No. 245099). In response to the prosecutor's application for leave to appeal, this Court vacated the Court of Appeals judgment and remanded to the Court of Appeals "for reconsideration of the issue whether the trial court's error, if any, in excluding the statements in question was harmless beyond a reasonable doubt." 474 Mich 915 (2005). This Court further stated, "The court should fully evaluate the harmless error question by considering the volume of untainted

---

[5] During defendant's second trial, defense counsel objected to the exclusion of the recanting statements on the basis of MRE 613 (prior inconsistent statements), but not on the basis of MRE 806 (attacking credibility of declarant). However, defendant raised the MRE 806 argument in his motion for a new trial. Although the majority claims that defendant did not even rely on MRE 613 at trial, *ante* at 9 n 15, the prosecutor has repeatedly conceded to the contrary. See Plaintiff-Appellant's Application For Leave, pp 4, 15, and Plaintiff-Appellant's Supplemental Brief, p 2. Further, what remains most significant in this regard is that defendant attempted to introduce the recanting statements and the trial court excluded them, and, as discussed later, this constituted a plain error that justifies a new trial.

7

evidence in support of the jury verdict, not just whether the declarants were effectively impeached with other inconsistent statements at the first trial." *Id.*

On remand, the Court of Appeals held that the error was not harmless beyond a reasonable doubt, and, thus, again reversed and remanded for a new trial. *People v Blackston (On Remand),* unpublished opinion per curiam of the Court of Appeals, issued May 24, 2007 (Docket No. 245099). In response to the prosecutor's second application for leave to appeal, we ordered and heard oral argument on whether to grant the application or take other peremptory action. 480 Mich 929 (2007). The majority now reverses the Court of Appeals.

## II. STANDARD OF REVIEW

A trial court's decision to exclude evidence is reviewed for an abuse of discretion. *Elezovic v Ford Motor Co*, 472 Mich 408, 419; 697 NW2d 851 (2005). A trial court's decision to deny a motion for a new trial is likewise reviewed for an abuse of discretion. *Barnett v Hidalgo*, 478 Mich 151, 158; 732 NW2d 472 (2007). The court abuses its discretion when it chooses an outcome falling outside the principled range of outcomes. *People v Babcock,* 469 Mich 247, 269; 666 NW2d 231 (2003).

I agree with the majority that it is unnecessary to determine whether the error here was preserved, constitutional error or unpreserved, non-constitutional error. However, unlike the majority, I reach this conclusion because I believe that even assuming that the error was unpreserved, non-constitutional error, and thus that the most difficult standard for defendant to satisfy is applicable, the error here

8

was not harmless and defendant is entitled to a new trial. As will be discussed more thoroughly in part III(B), assuming that the error is unpreserved, non-constitutional error, defendant must satisfy the plain-error standard of review, which requires him to establish: (1) that there was error; (2) that the error was plain; (3) that the error affected the outcome of the lower court proceeding; and (4) that the error resulted in the conviction of an actually innocent defendant or that the error ""seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings . . . ."" *People v Carines,* 460 Mich 750, 763-764; 597 NW2d 130 (1999) (citation omitted). In my judgment, he has clearly satisfied even this standard.

## III. ANALYSIS

## A. EXCLUSION OF EVIDENCE

As discussed earlier, although the trial court admitted Simpson's and Zantello's testimony from the first trial, it excluded their subsequent recantations. I agree with the Court of Appeals that the trial court abused its discretion when it excluded this evidence. MRE 806 provides:

> When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, *the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.* Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to

9

examine the declarant on the statement as if under cross-examination. [Emphasis added.]

MRE 806 specifically states that when hearsay statements are admitted, the credibility of the declarant may be attacked by any evidence that would have been admissible if the declarant had testified. It is undisputed that if Simpson and Zantello had testified against defendant at his second trial, the statements at issue here would have been admissible as prior inconsistent statements.[6]

At the motion for a new trial, the trial court agreed that the recanting statements were admissible under MRE 806, but concluded that the statements were "more prejudicial [than] probative," and, thus, were properly excluded under MRE 403. MRE 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

---

[6] MRE 806 states that a defendant may introduce evidence that attacks the credibility of declarants if this evidence would have been "admissible for those purposes if declarant had testified as a witness." That is, if the recanting statements would have been admissible to attack the credibility of the declarant if the declarant had testified according to the hearsay statement, they are admissible to attack the credibility of the declarant when only the hearsay statement is admitted. Contrary to the majority's view, *ante* at 10 n 16, MRE 806 requires us to assume that the declarant's testimony would have been consistent with the hearsay statement. Moreover, again contrary to the majority's view, *ante* at 10 n 16, I believe it is "undisputed" that the recanting statements here would have been admissible had declarants testified at trial, particularly given that the prosecutor has not argued otherwise even though this is one of the requirements of MRE 806.

"Evidence is not inadmissible simply because it is prejudicial. Clearly, in every case, each party attempts to introduce evidence that causes prejudice to the other party." *Waknin v Chamberlain*, 467 Mich 329, 334; 653 NW2d 176 (2002). "'"Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403 . . . ."'" *Id.* (citations omitted). "In this context, prejudice means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contentions, but that cannot be grounds for exclusion." *People v Vasher*, 449 Mich 494, 501; 537 NW2d 168 (1995). MRE 403 "'"is not designed to permit the court to 'even out' the weight of the evidence . . . or to make a contest where there is little or none."'" *Waknin*, 467 Mich at 334 (citations omitted). Instead, the rule only prohibits evidence that is unfairly prejudicial. "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998).

Given that the excluded evidence at issue here would have impeached two critical prosecutorial witnesses, this evidence cannot possibly be considered "marginally probative evidence," and, thus, cannot possibly be considered "unfairly prejudicial." Therefore, the trial court's holding to the contrary "fall[s] outside th[e] principled range of outcomes," *Babcock,* 469 Mich at 269, and thus constitutes an abuse of discretion.

Where a Michigan rule of evidence is modeled after its federal counterpart, it is appropriate to look to federal precedent for guidance, *People v Barrera*, 451 Mich 261, 267; 547 NW2d 280 (1996), although the latter is never dispositive. Both MRE 806 and MRE 403 are identical to their federal counterparts. In *United States v Grant*, 256 F3d 1146 (CA 11, 2001), a co-conspirator, Deosie Wilson, made statements during the conspiracy to an undercover police officer that implicated the defendant. Subsequently, Wilson signed an affidavit stating that the defendant was not involved in the crimes. The trial court admitted Wilson's statements to the undercover police officer, but excluded Wilson's subsequent affidavit. *Id.* at 1152-1153. The Eleventh Circuit Court of Appeals reversed, concluding that the affidavit was admissible under FRE 806 and could not be excluded under FRE 403. That court explained:

> Rule 403 is an "extraordinary remedy," whose "major function . . . is limited to excluding matter[s] of scant or cumulative probative force, dragged in by the heels for the sake of [their] prejudicial effect." The Rule carries a "strong presumption in favor of admissibility." Wilson's inculpatory co-conspirator statements were important pieces of evidence in the government's case. The impeaching statements in the affidavit would serve to cast doubt on Wilson's credibility and would have significant probative value for that purpose. Whatever prejudice to the government that might occur from admitting the affidavit statements could not substantially outweigh their probative value, anymore than it could if those affidavit statements had been admitted for impeachment following live testimony of Wilson to the same effect as his co-conspirator statements. [*Id.* at 1155 (citations omitted).]

In *Vaughn v Willis*, 853 F2d 1372 (CA 7, 1988), plaintiff Terry Vaughn, an inmate, testified that defendant Henry Willis, a guard, helped several inmates rape

Vaughn. Alvin Abrams, another inmate, testified during a deposition that he saw Willis help the inmates rape Vaughn. Before the trial in this civil action, Abrams wrote a letter to Willis's attorney stating that he would not testify at the trial and that he had made some mistakes during his deposition. Subsequently, Abrams was allowed to correct the mistakes made in his deposition, which simply pertained to the sequence in which the assailants entered Vaughn's cell, and again swore to the truthfulness of the deposition testimony. However, at trial, Abrams refused to testify, stating, in the absence of the jury, that he would not testify because he feared for his life, as well as the lives of his family. *Id.* at 1377-1378. The trial court admitted Abrams's deposition testimony, but excluded Abrams's letter to Willis's attorney on the basis that "the possibility of prejudice far outweighed any probative value the letter might have." *Id.* at 1379.

The Seventh Circuit Court of Appeals affirmed the trial court's decision to exclude the letter for several reasons. First, the letter's probative value was minimal because it was "very ambiguous." *Id.* at 1379. Second, the letter had the potential of confusing the jury because it referred to mistakes that the witness had made in his prior testimony, but those mistakes pertained only to irrelevant details and had subsequently been corrected. *Id.* at 1380. The court's third reason for affirming the trial court's decision to exclude the letter was that the witness did not want this letter disclosed because he "fear[ed] for his safety and that of his family." *Id*.

In the instant case, the trial court held that *Vaughn* is "more akin to our case in the sense that, although it wasn't prior trial testimony, it was prior testimony given in a deposition where there was a full right to cross examine, and the subsequent statement was a letter." I respectfully disagree. Both *Grant* and the instant case involve a statement by a witness/accomplice followed by a recanting statement by that same witness/accomplice. *Vaughn*, on the other hand, involved a statement by an eyewitness, not an alleged accomplice, followed by a letter refusing to testify, not a recanting statement. Unlike in *Grant* and in the present case, the letter in *Vaughn* did not assert that the witness's earlier statement was untrue. The probative value of the letter in *Vaughn* does not even remotely compare to the probative value of the subsequent recanting statements in *Grant* and in the present case because in the latter cases, the witnesses expressly stated that their previous statements were untrue. Furthermore, unlike in *Vaughn,* the recanting statements at issue in *Grant* and in the instant case were not at all ambiguous. To the contrary, they very clearly stated that the previous statements were untrue. In addition, unlike in *Vaughn,* neither *Grant* nor the instant case involves a witness who wants his subsequent statement excluded because he fears for either his own or his family's safety.

*Grant* and the instant case are similar in another respect. In *Grant*, the prosecutor argued that the subsequent statement should be excluded because it would provide a "complete defense" and because it was "particularly unreliable." *Grant,* 256 F3d at 1155. Similarly, in the instant case, the trial court excluded the

14

subsequent statements because they were an "advocacy for acquittal" and because the witnesses' "manipulative nature" made him "skeptical." However, the Court in *Grant* rejected these arguments, stating:

> The evidence of the affidavit statements could do no more than impeach and could not provide "a complete defense" if the government requested the limiting instruction to which it would have been entitled. See *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 733, 145 L. Ed.2d 727 (2000) ("A jury is presumed to follow its instructions.").

> The government's second fallback argument is that Wilson's affidavit statements were properly excluded from evidence because they were particularly unreliable . . . . The government maintains that because the statements in the affidavit were so unreliable, admitting them would not have affected the outcome of the trial— sort of a harmless error argument.

> The government's argument on this point is more than a little inconsistent with its Rule 403 argument that the affidavit statements were terribly prejudicial to its case. Putting that inconsistency aside, however, Rule 806 made the statements admissible for impeachment purposes, and the point of admitting inconsistent statements to impeach is not to show that they are true, but to aid the jury in deciding whether the witness is credible; the usual argument of the party doing the impeaching is that the inconsistent statements show the witness is too unreliable to be believed on important matters. See *United States v. Graham*, 858 F.2d 986, 990 n. 5 (5th Cir.1988) ("[T]he hallmark of an inconsistent statement offered to impeach a witness's testimony is that the statement is not hearsay within the meaning of the term, i.e., it is not offered for the truth of the matter asserted, see Fed.R.Evid. 801(c); rather, it is offered only to establish that the witness has said both 'x' and 'not x' and is therefore unreliable."). Given all the circumstances of this case, that strategy might well have worked to undermine the probative effect of Wilson's co-conspirator statements to such an extent that the verdict on the conspiracy charge would have been different. For that reason,

15

we reverse Grant's conviction on that charge. [*Grant,* 256 F3d at 1155-1156.][7]

These same arguments should likewise be rejected in this case. The subsequent statements here are not admissible to prove that defendant was not the shooter. Instead, they are admissible to show that two of the prosecutor's witnesses are not credible. As the Court of Appeals explained:

> [T]he statements were not offered to prove the truth of what was in them, but to attack the witnesses' credibility. As in *Grant*, the very reason the court excluded the statements, because it questioned the veracity and credibility of the witnesses, made the statements all the more probative on the credibility issue. Defendant should have been free to show the jury that the witnesses were unworthy of belief. Credibility is always a question for the jury, and the court erred in concluding that it would have been proper to insulate the jury from the witnesses' contradictory statements. [*Blackston (On Remand)*, *supra* at 7-8.]

The probative value of the recanting statements was not substantially outweighed by the danger of unfair prejudice under MRE 403. The probative value of these statements is evinced by the fact that there is a specific rule of evidence, MRE 806, that provides that this very kind of evidence, i.e., evidence attacking the credibility of a declarant when that declarant's hearsay statement is being used against the defendant, is admissible. The probative value of these recanting statements was especially significant given that the prior testimony of

---

[7] Although the majority concedes that *Vaughn* is distinguishable from the instant case, it argues that *Grant* is also distinguishable from the instant case. *Ante* at 17-18. While *Grant* and the instant case are not identical, for the reasons discussed earlier, I believe that *Grant* is sufficiently similar to be of considerable guidance.

16

these two witnesses was obviously extremely damaging. The only "unfair prejudice" at issue in this case was caused by the trial court's exclusion of the recanting statements, because it resulted in the jury being painted a false picture. If the recanting statements had been placed before the jury, the prosecutor would, of course, have been free to argue to the jury that the recanting witnesses had manufactured their testimony. However, instead, the jurors were told that one witness previously testified that defendant was the shooter and the other one testified that she overheard defendant and a co-defendant talking about blowing somebody's head off *without* being informed that the first witness subsequently stated that defendant was not even present when the victim was killed and that the second witness subsequently stated that she never heard defendant talking about the murder. This was critical evidence of which the jury, in fairness, should not have been deprived. For these reasons, I agree with the Court of Appeals that the trial court abused its discretion in excluding the recanting statements.[8]

---

[8] The majority argues that the recanting statements included irrelevant and unfairly prejudicial content; however, as the majority concedes, any such material could have been redacted. *Ante* at 12, 14. The key assertions made in the recanting statements were that these witnesses' prior testimonies against defendant were untruthful; these assertions were clearly not irrelevant or unfairly prejudicial and thus should not have been excluded from the jury. In addition, for the reasons discussed later in the "harmless error" section, I disagree with the majority that the recanting statements were merely cumulative, *ante* at 12, 14-16, 23.

## B. HARMLESSNESS OF ERROR

I also agree with the Court of Appeals that the error was not harmless. Simpson testified that defendant was the shooter. However, Simpson testified against defendant in exchange for full immunity; before testifying at the first trial, he indicated that he wanted to testify truthfully but was concerned that he would be charged with perjury if his testimony conflicted with his previous statement; Simpson has told several different versions of the events; in his very first statement to the police, Simpson said that Lamp was the shooter and that defendant was not even there, which is consistent with his most recent statement; Simpson testified that defendant cut off Miller's ear, but the police testified that there is no physical evidence indicating that Miller's ear had been cut off; Simpson testified that defendant killed Miller for Williams, but Williams testified that he did not even know Miller and the police indicated that there was no evidence that Williams was in any way involved with Miller's death; and Lamp threatened to kill Simpson if he said anything to the police to endanger his plea agreement, a threat on which Simpson believed Lamp would follow through.

Lamp also testified that defendant shot Miller. However, Lamp also testified against defendant in exchange for a plea agreement; Lamp testified that defendant cut off Miller's ear, but the police testified that there was no physical evidence indicating that Miller's ear had been cut off; Lamp testified that defendant killed Miller for Williams, but Williams testified that he did not even know Miller, and the police indicated that there was no evidence that Williams

was in any way involved in Miller's death; Lamp threatened to kill Simpson if he said anything to the police to endanger his plea agreement; defendant had an affair with Lamp's wife; and, finally, Simpson has stated that Lamp shot Miller.

Zantello testified that defendant was not at home when she arrived at home and that she overheard defendant and Simpson talking about blowing off somebody's head. However, in her very first statement to the police she said that defendant was home when she arrived there and that defendant was not involved in Miller's murder, which is consistent with her most recent statement; and she testified that she overheard defendant and Simpson talking about cutting off somebody's ear, but the police testified that there is no physical evidence indicating that Miller's ear had been cut off.

Mock testified that defendant told her that he shot Miller. However, Mock was a suspect in Miller's murder; Barr, who witnessed the same conversation, testified that defendant did not say that he was the shooter[9] and that they were all drunk when this confession allegedly occurred; and, finally, Mock testified that defendant said that he cut off Miller's ear, but Barr testified that she did not think that defendant said anything about cutting Miller's ear off, and the police testified that there was no physical evidence indicating that Miller's ear had been cut off.

---

[9] The majority claims that there were only "minor discrepancies" between Mock's and Barr's testimony. *Ante* at 21 n 27. Given that Mock testified that defendant said that he was the one who killed Miller and Barr testified that defendant did not say he was the one who killed Miller, I disagree.

19

There are also inconsistencies between the testimonies of Lamp, Simpson, Mock, and Zantello regarding who showed up when at defendant's house on the night that Miller was murdered. See note 2, *supra*. Finally, three of defendant's sisters testified that defendant was home the night that Miller was killed.

The evidence against defendant, in other words, was anything but overwhelming. All the prosecutor's witnesses had compelling motives to lie. Simpson, Lamp, and Mock were all suspects. Zantello was defendant's ex-girlfriend and, according to Zantello, her then-current boyfriend, who beat her, forced her to testify against defendant because the prosecutor-- the same prosecutor prosecuting defendant's case-- allegedly promised him no prison time if she did so. Under these circumstances, excluding Simpson's and Zantello's written statements that indicated that defendant was innocent was not harmless error. These statements could very well have caused the jury to have reasonable doubt about defendant's guilt.

The prosecutor argues that the recanting statements are cumulative because the jury already heard evidence that Simpson and Zantello had made prior inconsistent statements. However, Zantello's earlier inconsistent statement made to the police just after the incident and while she was still living with defendant did not undermine her first trial testimony to the extent that her later written statement would have. As the Court of Appeals explained:

> The jury heard evidence that Zantello's first statements to police were that defendant was home when she returned from the hospital, and that she knew nothing about Miller's disappearance

20

except that defendant was not involved. However, these statements were given shortly after Miller's disappearance, and when Zantello was living with defendant. The jury could have easily decided that the earlier inconsistent statements did not undermine the trial testimony, reasoning that Zantello had given a statement in March, 1990 that incriminated defendant, and that at the time of trial, Zantello was no longer involved with defendant, and was therefore no longer willing to lie in his behalf. The fact that Zantello reaffirmed her earlier position shortly before the second trial would have undermined her trial testimony in a way that the earlier statements could not. [*Blackston (On Remand), supra* at 8.]

In addition,

[r]egarding Simpson, although he was impeached with having given prior inconsistent versions of what happened to Miller, as set forth above, and he admitted at the first trial that he had told Jody Harrington shortly after the shooting that only he and Lamp were involved, he also admitted telling police that he never made such a statement to Harrington. Further, Detective Sergeant Averill testified that Simpson had remained consistent in the version of events he claimed to have witnessed, and stated that Simpson's testimony at defendant's first trial had been consistent with this version of events. Had Simpson's inconsistent written statement . . . been admitted under MRE 806, the jury would have had a very different view of Simpson's credibility. [*Id.*]

Because the evidence against defendant is by no means overwhelming, and because the excluded evidence was significantly probative, I agree with the Court of Appeals that the error here was not harmless.

Even assuming that the issue was not properly preserved because, although defendant objected to the exclusion of the evidence on the basis of MRE 613, he did not object on the basis of MRE 806, MRE 103(d) provides that unpreserved "plain errors affecting substantial rights" can be raised for the first time on

21

appeal.[10] As discussed in part II, in order for a defendant to obtain relief for an

_____

[10] The prosecutor arguably should be precluded from asserting that the issue is unpreserved given that, in his brief to the Court of Appeals, he conceded that defendant "had brought a motion for a new trial on this basis expressly under MRE 806, and thereby, preserved the issue for appeal" and stated that as "a preserved claim of constitutional error, this Court must determine whether the people have established beyond a reasonable doubt that any error was harmless." Moreover, the error was arguably properly preserved under MRE 103, which provides:

> (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

> (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

> (2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked. Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.

> \* \* \*

> (d) Plain error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

Given that the trial court excluded evidence, all that was required to preserve the issue under MRE 103(a)(2) was to make "the substance of the evidence . . . known to the court." Nobody disputes the fact that "the substance of the evidence was made known to the court." Further, the error arguably denied defendant his right to confront witnesses against him, and thus was arguably of constitutional dimension.

(continued…)

unpreserved error, the defendant must establish: (1) that there was an error; (2) that the error was plain; (3) the error affected the outcome of the lower court proceedings; and (4) the error resulted in the conviction of an actually innocent defendant or that it """seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings. . . .""" *Carines*, 460 Mich at 763 (citation omitted). Because Simpson's and Zantello's recanting statements are clearly admissible under MRE 806, and should not have been excluded under MRE 403, there was error, and the error was plain. Because the evidence against defendant was by no means overwhelming, the exclusion of the recanting statements of the prosecutor's two critical witnesses may very well have been outcome determinative, and the error may have resulted in the conviction of an actually innocent defendant.

Alternatively, the error certainly and seriously affected the fairness, integrity, and public reputation of the judicial proceeding. The jury was affirmatively apprised that two witnesses previously testified against the defendant (one testified that he saw defendant shoot Miller and the other testified that she

_____

(…continued)
 If the error was constitutional, preserved error, the prosecutor would be required to prove that the error was harmless beyond a reasonable doubt. *People v Anderson,* 446 Mich 392, 406; 521 NW2d 538 (1994). If the error was non-constitutional, preserved error, defendant would be required to prove that it was more probable than not that the error was outcome determinative. *People v Lukity,* 460 Mich 484, 495-496; 596 NW2d 607 (1999). As discussed in part II, it is unnecessary to determine whether the error was constitutional or non-constitutional, or preserved or unpreserved, because even assuming that it was unpreserved, non-constitutional error, defendant is entitled to relief.

23

heard defendant talking about shooting Miller), but it was never told that these witnesses subsequently signed written statements indicating that defendant was actually innocent. By restricting the jury's access to *all* of the available evidence, the trial court presented the jury with a highly distorted view of the state of the evidence against defendant and thereby deprived the defendant, and the community, of a fair trial. Therefore, even assuming that the issue is unpreserved, there was plain error requiring reversal.

## IV. CONCLUSION

The trial court abused its discretion in allowing the jury to hear the hearsay testimony of two critical witnesses, while excluding their recanting statements, and in denying defendant's motion for a new trial. Therefore, I would affirm the judgment of the Court of Appeals that reversed the trial court and remanded this case for a new trial.

Stephen J. Markman
Michael F. Cavanagh
Marilyn Kelly

24